Good morning, Your Honor. May it please the Court, I'm Robert Jobe, and I'm appearing today on behalf of the petitioner Sherny Saroha. This case turns on whether Ms. Saroha willfully misrepresented herself when she applied for asylum in 1999. An immigration judge found that she had done so in two distinct ways. First, by claiming that she'd never been detained by checking a box on the form, the box that said no, as to whether she'd ever been detained. And secondly, by failing to list her employment at a VHS bank where she worked until that bank was liquidated in 1997. Obviously, this Court's case law and the government's own witness recognize that there are errors and omissions in asylum applications all the time. And so in a case like this, it's essential that we assess whether the errors and omissions in Ms. Saroha's application were innocent mistakes or whether they were deliberate misrepresentations. That's the critical question. Now, rather than explore whether the flaws in Ms. Saroha's application were innocent mistakes or willful misrepresentations, the immigration judge insisted throughout these proceedings, you'll see this on page 236 of the transcript, the Certified Administrative Record, 237, 238, 241, as well as in the immigration judge's decision at page 80, that the test that he's applying is whether this judge, he says the test is, for determining whether there's been a willful misrepresentation, is whether a reasonable person in Ms. Saroha's position should have disclosed, for example, her detention. Well, that test, it's more like a negligence test. That's not a test to determine whether somebody deliberately and knowingly misrepresented. The judge applied the wrong test. Kennedy, I'm sorry. Tell me where in the IJ decision you're referring to. That's on page 180, Your Honor. 180? Yeah. Okay. I got you. Go ahead. But so in that decision near page 180, to support his invocation of a reasonable person test, the IJ cited this Court's decision in Forbes, which he said foreclosed any consideration of Ms. Saroha's subjective beliefs about the meanings of these different terms or her claim that she believed her answers to be true. The problem is that in Forbes, the Court did just the opposite. It evaluated Forbes's claim that he believed his answers on an immigration form were truthful, and it went ahead and rejected that claim, as the Board had done, finding it not credible. Here the Board never really, or the immigration judge nor the Board, never grappled with the credibility of Ms. Saroha's contention that's rife throughout the naturalization interview, that she understood the term detention, and she's not a fluent English speaker, she's not a native speaker. What about her statement to the effect that she didn't include her detention because she was afraid that it would affect her asylum application?  That's what the judge says is in his decision, Your Honor, but if you have to actually look at that, that's not what she says. That's on page, I believe, 1824. Let me see here. No, it's 1854 and 1855. And what she actually says is that on 1854, she says again, he didn't ask. She's not an English speaker, a native speaker, so she says he doesn't ask. And then on the next page, she says, he doesn't ask me, and she says, I was saying if I give too much information. That's all she said. She said the thrust of it is her attorney never asked her. She was consistent about that, about whether she'd ever been detained. Even Eugene Wong, who testified, he never suggested that he'd asked her if she'd been detained. All he said is that he'd done the intake. And in this citizenship interview, since the use of the word detention is so important, I'd like to just walk through some of her statements there, because this whole thing gets started, let's see here, the whole thing gets started when an immigration officer asks her, let me see if I can pull it up, asks, an immigration officer uses the word detention. But in the transcript, that is attributed to Ms. Serroja. That's why we submitted the videotape. Some of the imputations here as to who's speaking in the transcript are wrong. The first use of the word detention, it's not by, in the citizenship interview, it's not by Ms. Serroja. It's by an immigration officer. But then they tell her repeatedly, okay, you were arrested, notwithstanding your disagreement, you were arrested. And they tell her repeatedly, you were detained. And when they have her to write this, begin her, have her write a statement, they tell her to label the statement regarding my detention in Indonesia. And then she comes forward and she says, and I think this is a critical point here, she says to the officer, so is the word detained, is that the appropriate word to use for just going back and forth in an investigation like this? It's detained? That's considered detained? That's her question to the officer. And then the officer comes back and says, yes, you should use the word detained. It'll look better for you because other people were detained even longer than you. And so then she starts using the word detained. But clearly, throughout this thing and even after that conversation, she comes back and she's resistant to accept the characterization as a detention. She keeps saying, I thought a detention required a warrant. But, you know, the judge might find that testimony not credible. But that's her subjective – that's her testimony about her subjective belief. He can't ignore it, because the issue here is not what a reasonable person would do. The issue here is whether this particular person willfully misrepresented. And to willfully misrepresent, she has to have had knowledge that she was saying something incorrect, and she has to have done so deliberately. The judge never addressed that question. So on the issue of whether she misrepresented on the question of having been detained, the judge just blew it. He applied a completely incorrect test. Instead of willfulness, he applied a negligence test. The only other issue here that's presented is what happened with respect to her failure to list her employment at this bank, this BHS bank, on the asylum application. And that's true. The asylum application does not mention her employment at BHA – BHS Bank. On the other hand, it doesn't mention her employment here in the United States either. The judge assumed that because she left off any reference to BHS Bank, and that was material, that she had done so deliberately. But that wouldn't explain why she left off the fact that she was working here in the United States from January of 1909 to October of 2000. And that's set forth in the administrative record at 3070. She didn't list that either. That would suggest that, in fact, she was just being careless. But in terms of how this came about, why that bank was not listed on the form, we don't know. And we may never know, because the government was unable to procure the person who prepared the application. Obviously, she didn't prepare it herself. So we have no idea, you know, what kinds of questions were asked in the application process. They – we brought in Eugene Wong, who testified that although he signed something on the back of the application stating that the application had been read back to Ms. Siroha, he said, actually, that's not my signature. I didn't sign it. Somebody signed my name. I can't tell you whether the thing was read back to her. So we don't know what happened in the actual preparation of the asylum application. She goes into the interview before the asylum officer. And this would have been the place to catch mistakes that had been made in the asylum process. But the asylum officer didn't testify as to what went down in that interview. And his notes are incredibly incomplete, but it's clear from the notes that the issue of her employment came up, because on the asylum application, all it says is that she's a general manager. In the assessment to refer that he wrote up, he characterizes her as a financial analyst. Sotomayor, I want to go back to her statement about why she didn't put the detention on her application. And if you read in context a little before 1854 and some after, the – basically, Officer Morita is basically saying, well, you need to tell the truth. Of course, your husband is a U.S. citizen, and why didn't you do that? And if you read those three or four pages, she's basically – why isn't it reasonable to say that – Can you show me exactly where you're looking, Your Honor? Under 1852 to 1856, 7, that whole conversation, it's not – it may not be 100 percent crystal clear, but the question is, under substantial evidence, why isn't the I.J.'s characterization that she basically was saying, even though my attorney didn't ask me, I didn't tell him this because I was afraid it would affect my asylum application? I mean, I think that's a – not an unfair summary of those pages over that period. So my question is this. Even if she didn't say precisely what the I.J. wrote in the opinion, why isn't that a reasonable characterization of the testimony? Because she insists throughout – I don't think you could take a couple lines in isolation. No, it's not a – it's you taking a whole range there. Well, some of that is about why she said certain things in the citizenship application, and you need to sort that stuff out and focus only on what she said with respect to the asylum application, and it's jumbled. But throughout, when she's talking about the word detention, she insists, I would say maybe ten times, that she never thought she was detained because, for her, detention is equated with an arrest, she thinks there's a warrant. And when they ask her, well, did you tell your lawyer, her first response, both times, is he didn't ask me. He didn't ask me, and so it begs the question of the question of the question. He didn't ask me, and I didn't tell him about it because I thought it would affect my application. Right. But she's only going to provide information that's relevant to the application. And the way I'm going to tell you this, Your Honor, is this. My lawyer never asked me if I was detained. And why did she not tell him? Because she didn't consider it a detention, and she didn't go on and offer additional information about this non-detention. I see your point. Because she thought it would affect her case. I'm out of time, so. We'll give you some time for rebuttal. Thank you, Your Honor. Good morning, and may it please the Court, my name is Elizabeth Chapman, and I represent the Attorney General. To prevail before this Court, Ms. Seroha must demonstrate that the record not only theoretically could support her theories, but compels them. Therefore, she must demonstrate that the record compels the conclusion that she did not willfully misrepresent, one, her employment as the financial director of a bank that was seized and liquidated by the government after causing approximately $260 million of damages to the Indonesian people. And two ---- What is your response to Mr. Job's, I don't want to say characterization, but the way he reads how the word detention even got into the interview? My initial response is that the immigration judge did not make a reasonable person test. He said, this is foreclosed by Forbes, and Petitioner's counsel does not challenge Forbes in the opening brief. So that would be my initial response. Second response, to set forth the case ---- But he challenges that the immigration judge was making kind of a negligence-type reasonableness, which is at odds with Forbes. Right. So why isn't the issue squarely on the table? And then related to that, are you supporting the immigration judge's characterization of how reasonableness is defined? No, I think first it's important to set forth the facts here. She was held against ---- No, I'm asking you a legal question first. Sorry, can you please repeat the question? Sure. The legal question is this. You said, well, he didn't even really challenge Forbes in his brief. Well, of course, he wouldn't challenge Forbes. It's controlling Ninth Circuit law. But what her lawyer did do is say that the immigration judge is using the wrong test for determining willfulness and making it more of a negligence standard. So I'm asking you whether you adopt the immigration judge's statement on reasonableness or you think that there's some other standard which determines willfulness. Well, I interpret what the immigration judge did ---- Could you move up your mic just a bit? Yes. Sorry, I have a cold. I'm sorry. My interpretation is that the immigration judge stated that under Forbes, terms like arrest or detention on an application are not subject to interpretation, and that the immigration judge then went on to opine that besides it cannot be the policy of our country, that terms like arrest or detention are subject to the unreasonable interpretations of applicants. But the language would seem to indicate that he was applying an objective test rather than a subjective test. True? I mean, when you're talking about a reasonable person, you're talking about an objective test, which is a negligence test and not subjective, which would go to willfulness. I believe that the immigration judge did find that it was willful. I think that that paragraph where the immigration judge states that it's not open to interpretation and that what she experienced was a detention, I believe that was him opining and saying that Forbes foreclosed this by stating that it's not open to interpretation and that he believes that she did willfully misrepresent herself and that the evidence demonstrates that it was willful. But that's not exactly what he said. He used the term of a reasonable person, and then he talked about Forbes. And you won't find anything about a reasonable person in Forbes, do you? No, you don't. No. Turning back to the removability finding in this case, substantial evidence supports the agency's removability in finding this case. First, it's important to point out that Ms. Serroja herself has never claimed that this was not willful. Her attorney has suggested this, but she herself has never claimed that her misrepresentations were not willful. Where would she say that? During the immigration proceedings. But she did not testify. She — Well, I guess I'm having trouble with that, because if the ultimate determination based on the interviews is one of the immigration judge to make that judgment based on the record, correct? Right. And she's now arguing, based on the record, that it doesn't support willfulness. Right. I'm just pointing that out, that that's one thing to take into consideration, is that she hasn't testified that it wasn't willful and that there's — to the contrary, as you pointed out, she testified that she did not reveal this information because she was afraid it would affect her application. She also signed her applications twice under penalty of perjury, saying she was aware of the contents of her application. What about her job statement? Could you address that? I think you had started down that road on the factual issues related to what she said or what she didn't say, actually, about her employment with this Indonesian financial institution. Right. So the fact that she omitted any information about her job, that — I believe that's intertwined with her three-week detention, her — she was detained and questioned and eventually convicted for the actions having to do with her job. And the record demonstrates — substantial record evidence supports that her omission of her job was not unintentional, that she willfully misrepresented both her job and her three-week detention and interrogation on her asylum application. So what do you make of the — apparently there were additional documents submitted. We don't know quite what they were. But then the jobs that were reported later from the asylum officer would seem to indicate that he had some different information. These are the extra documents that were submitted after the asylum interview. Not one of those documents made any reference to her job at the bank or to the Indonesian banking collapse. So to say that by submitting those extra documents, she disclosed her banking position and her three-week detention interrogation, the record does not support that. You would agree, in most cases, an omission of a job on an asylum application is regarded as immaterial, right? In most cases. Yes. But in this case, she was detained — Why is it material? In this case, it's — I mean her employment. I'm talking about her employment. Right. As an initial matter, that's not an issue before the case, whether or not it's material was not exhausted before the board. But in this particular case, she was detained for three weeks in Indonesia because the owners of the bank had fled the country and she was detained and interrogated regarding her position as the bank. She then was convicted and sentenced to 20 years of jail in relation to the actions she did with her job. Her job and her three-week detention interrogation are intertwined. They're not two separate. This wasn't an accidental, immaterial typo on the application. The record supports that this was material. When did — by the way, when did she learn about her — I guess there was an in absentia conviction, right? Right. But when did she learn about that, according to the record? According to the record, she — let's see — she claims that she learned about it in 2010 when a friend Googled her name or told her she Googled her name. Her entire family is still in Indonesia, but she claimed that even though this was headline news in Indonesia, her family was too busy to read the newspaper. And so she had no idea that she had been arrested and convicted in absentia. I'm sorry, not arrested, convicted in absentia. That's the testimony before the naturalization interview. But because she didn't testify during her immigration proceedings, we don't have testimony as to that. We just have what she said during her naturalization interview. And what year was she married? The United States. What year was she married in the United States? You know, I don't have that information. And she has two U.S. citizen children, true? Yes, I believe she does, and a U.S. citizen husband. If the panel has no further questions, I'd like to sum up. The petitioner in this case repeatedly lied to immigration officials in an attempt to honestly take advantage of the country's immigration systems. The record does not compel the conclusion that her misrepresentations were anything but an attempt to hide her past and game the system. The record overwhelmingly supports the agency's finding in this case. Thank you.  Put two minutes on for rebuttal. The government says that the evidence is clear that Ms. Soroja willfully misrepresented her employment history on the asylum application. But aside from the fact that her employment history isn't fully set forth, where's the evidence that it was deliberate? Where's the evidence that it was not through inadvertence? They don't mention any. All we have here is an incomplete form. We have no idea why it's incomplete, again, because the preparer didn't testify, the asylum officer hasn't testified. We know that when she went in for this interview, there were some discussions about her employment. And the government witness said that if there were discussions about employment, they would be reflected on the form, but they're not. But if you look at page 834, down the middle of that page, it's the officer's notes. The officer's notes are difficult to read, but halfway down that form, you'll see something that says PROF colon, standing for profession, and then it says financial division, DIV, management, MGT division, NPU holding company, real estate, importer, and then something about medicine, resigned in 1298. We know that there were conversations about her employment at the interview that didn't make it onto the form. And in the absence of a clear record as to what those conversations were, what was said, and particularly in light of the fact that the immigration officer specifically seems to have requested documents about the banking crisis, there's no way we can say there's clear, convincing, and unequivocal evidence that in this case, she deliberately and knowingly misrepresented, rather than this being, as is all too common, just an inadvertent error on the forms. The last thing I want to say is obviously the government's misstating the standard of review. We don't have to show by compelling evidence that she's not deportable. All we have to show is that by compelling evidence that no reasonable fact finder could conclude that they've met their standard, the high standard of clear, convincing, and unequivocal evidence. Roberts. Thank you, counsel. Thank you. Case just heard will be submitted for decision. Thank you for your arguments.
judges: Thomas, Tashima, McKeown